## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LOUISIANA FAIR HOUSING ACTION CENTER | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | |
| AZALEA GARDEN PROPERTIES, LLC | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | **Jury Trial Requested** |

## <u>COMPLAINT</u>

### <u>PRELIMINARY STATEMENT</u>

1.      The Louisiana Fair Housing Action Center ("LaFHAC") brings this suit pursuant

to the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 *et seq*., for injunctive, monetary

and declarative relief against Defendant Azalea Garden Properties, LLC ("Defendant") for

engaging in a pattern or practice of illegal discrimination on the basis of race and disability at

Azalea Gardens, an apartment complex Defendant owns and manages in Jefferson, Louisiana.

Defendant maintains and enforces a policy of automatically excluding any person with a record of

a criminal conviction or arrest from renting or living in an apartment at Azalea Gardens.  The

policy excludes all such people regardless of the age and nature of the conviction or arrest,

evidence of rehabilitation, or any other factor related to whether a specific person poses any threat

to safety.  Defendant's policy has the purpose and effect of discriminating against African

Americans in violation of the Fair Housing Act.  Additionally, Defendant's policy unlawfully

denies reasonable accommodation to people with disabilities in violation of the Fair Housing Act.

## JURISDICTION AND VENUE

2.      This is an action alleging housing discrimination on the basis of race and disability in violation of the Fair Housing Act.

3.      This Court has subject matter jurisdiction over Plaintiff's claims arising under federal law pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 3613.

4.      Declaratory and injunctive relief is sought pursuant to 42 U.S.C. § 3613(c)(1), as well as Rules 57 and 65 of the Federal Rules of Civil Procedure.

5.      Venue is proper in the United States District Court for the Eastern District of Louisiana under 28 U.S.C. § 1391(b) because the events or omissions giving rise to Plaintiff's claims occurred there, and the property that is the subject of this suit is located there.

## PARTIES

6.      Plaintiff Louisiana Fair Housing Action Center, Inc. ("LaFHAC") is a non-profit corporation organized under the laws of Louisiana.

7.      LaFHAC is an "aggrieved person" as defined by the Fair Housing Act and brings this action on its own behalf.

8.      Defendant Azalea Garden Properties LLC is a Louisiana limited liability company. At all times relevant to the complaint, Defendant was the owner and operator of the apartment complex known as "Azalea Gardens" located at 519 Lauricella Ave, Jefferson, LA 70121.

9.      The units at Azalea Gardens are "dwellings" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b).

10.     At all times relevant to the complaint, Defendant had knowledge that discriminating in leasing on the basis of race and disability violates federal fair housing laws.

**FACTUAL ALLEGATIONS**

**I.     LAFHAC'S INVESTIGATION OF AZALEA GARDENS**

11.     LaFHAC is a nonprofit entity with a mission to eradicate housing discrimination in Louisiana.  To achieve this mission, LaFHAC engages in testing and other investigations of housing discrimination.  It employs "testers," who pose as prospective residents, renters, and homebuyers, to obtain information about the conduct of housing providers for the purposes of determining if housing discrimination is taking place.  Testing is an investigative tool that has long been utilized by the United States Department of Justice and fair housing organizations as an essential means to detect and confirm discriminatory practices that may go otherwise undetected.

12.     Testing is a simulated housing transaction that evaluates a housing provider's treatment of individuals to determine if the provider is discriminating in violation of the FHA. LaFHAC periodically audits the rental housing market to ensure that discriminatory practices are not occurring in the community.  These investigations involve the testing of a sample of housing providers within a short period of time (as determined by the availability of testers and number of properties advertising units for rent).

13.     LaFHAC tested Azalea Gardens as part of a 2015 audit of the New Orleans-area rental housing market.  Based on the results of its audit testing, LaFHAC decided to perform additional testing of Azalea Gardens.  LaFHAC's testing, as detailed below, revealed that Defendant is engaged in discriminatory criminal background screening practices in its operation of Azalea Gardens.

14.     The application materials for Azalea Gardens state the following policy concerning an applicant's criminal history[1]: "If the criminal background check reveals any of the following,

---

[1] For purposes of this Complaint, "criminal history" and "criminal record" refers to any prior criminal conviction, charge, or arrest, including charges and arrests that did not result in conviction.

it will be grounds for rejecting an application: [a]ny [m]isdemeanor conviction in the preceding five (5) years including but not limited to a person or property misdemeanor; [a]ny [f]elony convictions (with no time limit); . . . [a]ny drug related convictions, including petty offenses; . . . [and] [a]ny of the above related charges resulting in 'Adjudication withheld' and/or 'deferred Adjudication.'"

15.     The criminal background screening form included with the application for Azalea Gardens includes the following questions: "Have you ever been arrested for, but not charged with, any federal, state, or municipal criminal offense?"; "Have you ever been arrested for molesting or abusing a minor?"; and "As of the date of this authorization, do you have any pending criminal charges against you?"

16.     Despite the stated limits, LaFHAC's testing investigation revealed that Defendant applies the policy in a manner that excludes all applicants with any criminal history, regardless of the age and nature of the conviction, evidence of rehabilitation, or any other factor related to whether a specific person poses any threat to safety.  LaFHAC's testing makes clear that in practice, the Defendant's tenant screening process excludes all applicants with any criminal history as reported by a criminal background check, contrary to the express language of its criminal background screening policy.  Defendant's application of the policy thus functions as a "blanket ban" on prospective tenants with any criminal history.  Such application has the purpose and effect of discriminating against African Americans in violation of the Fair Housing Act by excluding a disproportionate number of potential African American tenants from renting and living at Azalea Gardens.

17.     Additionally, the policy's stated exclusion of all persons with "[a]ny drug related convictions, including petty offenses" unlawfully discriminates against and denies reasonable

accommodation to people recovering from addiction who are not currently using a controlled substance, in violation of the Fair Housing Act.  An exemption from a criminal background policy is both reasonable and necessary where a potential tenant has been diagnosed with addiction, undergone treatment, and is not currently using a controlled substance illegally.  By automatically denying the applications of all persons with any drug-related convictions, Defendant's policy unlawfully excludes such persons who have one or more convictions related to their addiction on their record.

18.     On information and belief, Defendant continues to apply its policy such that it functions as a blanket ban against potential tenants with any criminal history, including any drug-related convictions, without any individualized consideration of an applicant's circumstances.

### *Testing of June 24, 2015*

19.     On June 22, 2015, LaFHAC tester MW called Azalea Gardens to inquire about units available to rent.  MW was told to call back at another time and ask to speak with an agent identified only as Heidi, who could provide her with more information.

20.     On June 22, 2015, MW called Azalea Gardens again and spoke with Heidi.  MW arranged with Heidi to view a model home on the Azalea Gardens property the following afternoon or on the morning of June 24, 2015.

21.     On June 24, 2015, at 9:52 a.m., MW arrived at the Azalea Gardens property at 519 Lauricella Avenue to view a model home.  An Azalea Gardens employee, identified only as Jordan, showed MW the model home.

22.     After viewing the property, MW inquired about Azalea Gardens' credit and criminal background check policies.  Specifically, MW inquired about how a seven-year-old misdemeanor would affect her odds of being approved to rent with Azalea Gardens.  Jordan

responded that he was not exactly sure what incidents detected by a criminal background check would disqualify an applicant and that the property manager, identified only as Danielle, would be able to answer MW's question.

23.     MW spoke with Danielle and asked whether a seven-year-old misdemeanor would prevent her from being approved to rent with Azalea Gardens.  Danielle responded, "If it shows up, yeah."  MW departed the property shortly afterward.

24.     While testing Azalea Gardens, MW received rental application materials, which included the property's criminal background policy as stated above.  Danielle's statements to MW discouraging MW from submitting an application, even though MW's misdemeanor was seven years old at the time, is a clear departure from Azalea Gardens' criminal history criteria as contained in its rental application materials, which states the property will only consider misdemeanor convictions going back five years.

### *Testing of July 28, 2015*

25.     On June 16, 2015, at approximately 1:42 p.m., LaFHAC tester EP called Azalea Gardens and spoke with an Azalea Gardens agent identified only as Heidi.

26.     After requesting and receiving details about rental availability and pricing, EP inquired about Azalea Gardens' credit and criminal background check policies.  Specifically, EP asked what the criminal background check is meant to detect and what would disqualify her from renting with Azalea Gardens.  Heidi responded that the criminal background check was to ensure that the applicant does not have "a criminal background."  EP ended the call shortly afterward.

27.     On July 28, 2015, at approximately 12:47 p.m., EP arrived at the Azalea Gardens property at 519 Lauricella Avenue and asked to view a model home.  Heidi then showed EP the model home.

28.     After viewing the model home, EP inquired about Azalea Gardens' credit and criminal background check policies.    Specifically, she asked whether a three-year-old misdemeanor for possession of marijuana would disqualify her from renting with Azalea Gardens if detected by a criminal background check.  Heidi responded that this would likely be detected by the criminal background check.  EP then asked, "If it shows up, then [the application is] out?" Heidi responded, "Yeah."

### *Testing of October 24, 2016*

29.     On October 24, 2016, at approximately 1:44 p.m., LaFHAC tester BA called Azalea Gardens and asked an Azalea Gardens employee, identified only as Heidi, about rental availability and pricing.

30.     After receiving details about availability and pricing, BA asked Heidi about the property's rental application process.  Heidi responded that Azalea Gardens performs credit and criminal background checks and assesses an application fee.

31.     BA later asked what the criminal background check is intended to detect and what results would disqualify him from renting with Azalea Gardens.  Heidi responded, "Anything on the criminal background will decline [the application]."  BA then asked whether a fifteen-year-old misdemeanor for the possession of marijuana would disqualify him from renting with Azalea Gardens.  Heidi responded that the conviction would most likely be detected by the criminal background check unless it was expunged.  BA then asked what would happen if the conviction was detected by the criminal background check, and Heidi responded, "it declines [the application], yeah."

32.     BA then inquired as to who declines the rental applications.  Heidi responded, "we put [the application] through a system in the computer and it automatically calculates all the data

and stuff." BA then asked, "It gives you a result?" Heidi responded, "It will either say 'pass,' 'pass with conditions,' . . . or 'fail' for any kind of criminal [background]."

### *Testing of January 6, 2017*

33.   On January 6, 2017, at approximately 1:45 p.m., LaFHAC tester AO called Azalea Gardens, spoke with an Azalea Gardens agent identified only as Heidi, and asked about rental availability and pricing.

34.   After receiving details about rental availability and pricing, AO asked what the application process entailed. Heidi responded that Azalea Gardens performs credit and criminal background checks and assesses an application fee.

35.   AO then asked Heidi what the criminal background check is intended to detect and what results would disqualify him from renting with Azalea Gardens. AO disclosed that he had a ten-year-old felony charge for possession of drug paraphernalia on his record. Heidi responded, "[A] felony charge or drugs is going to automatically decline [the application.]" AO then asked, "Even if [the charge] is ten years old?" Heidi responded, "Yep, unfortunately so. It follows you around for the rest of your life." AO ended the call shortly afterward.

### *Testing of November 30, 2021*

36.   On November 30, 2021, at approximately 2:42 p.m., LaFHAC tester BB called Azalea Gardens, spoke with an unnamed Azalea Gardens agent, and asked about rental availability.

37.   After receiving details about rental availability, BB asked what the property's application process entailed. The agent responded that Azalea Gardens performs a credit check, criminal background check, and requires that the applicant's income is three times the monthly rent price.

38.     BB then asked the agent how a seven-year-old misdemeanor charge for loitering, which he pled guilty to, would affect his odds of being approved to rent with Azalea Gardens.  BB asked if it would be a problem as it has been a problem in the past, and the agent responded, "Yeah, it just depends.  Sometimes it will come up and other times it won't.  It is a fifty-dollar application fee, so if you want to take the chance and just see, you're more than welcome to."

39.     In response, BB asked whether Azalea Gardens is strict about enforcing its criminal background check requirements. The agent responded, "It's actually through a computer system so we don't really have the pick-and-choose type of stuff. We put it all in and it just determines." BB ended the call shortly afterward.

### *LaFHAC's Complaint to HUD*

40.     On December 5, 2017, LaFHAC (then operating as the Greater New Orleans Fair Housing Action Center) submitted a complaint of housing discrimination to the United States Department of Housing and Urban Development ("HUD").  HUD referred LaFHAC's complaint to the Louisiana Department of Justice.  LaFHAC's complaint was pending before the Louisiana Department of Justice until November 18, 2020.

41.     LaFHAC conducted additional testing of Azalea Gardens on November 30, 2021, as detailed above, which revealed that Defendant is still engaged in discriminatory criminal background screening practices.  Accordingly, this complaint is timely filed.  *See* 42 U.S.C. § 3613(a)(1)(B).

## II.    DEFENDANT'S USE OF A BLANKET BAN AGAINST RESIDENTS WITH CRIMINAL RECORDS CONSTITUTES UNLAWFUL DISCRIMINATION

42.     Facially neutral housing practices that have a disparate impact on the basis of race are prohibited by the Fair Housing Act unless they are necessary to achieve a legitimate business purpose that cannot be satisfied through a less discriminatory alternative practice.  Blanket bans

that automatically deny housing to people with any criminal history, including the blanket ban maintained and enforced by Defendant at Azalea Gardens, are unlawful under this standard. Such bans have a severe disparate impact on African Americans, and any legitimate safety concerns can be satisfied through the less discriminatory alternative of giving individualized consideration to each potential resident's circumstances and desirability as a tenant.

43.    Guidance issued by the U.S. Department of Housing and Urban Development ("HUD") in 2016 states that "housing providers that apply a policy or practice that excludes persons with prior convictions must still be able to prove that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest. A housing provider that imposes a blanket prohibition on any person with any convictions record – no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then – will be unable to meet this burden."[2]

44.    HUD's Guidance also states, "A housing provider with a policy or practice of excluding individuals because of one or more prior arrests (without any conviction) cannot satisfy its burden of showing that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest. As the Supreme Court has recognized, '[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct.'"[3]

45.    Defendant's application of its criminal background policy, such that it functions as a blanket ban of people with any criminal history, violates this HUD guidance and constitutes unlawful housing discrimination.

---

[2] U.S. Dep't of Hous. & Urban Dev., Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions 6 (2016).
[3] *Id.* at 5 (citation omitted).

A.      **Blanket Bans Disproportionately and Severely Impact African Americans at the National, State, and Local Levels**

46.     On average, over 650,000 people are released from confinement every year in the United States and become the targets of blanket bans in the housing market.  These people are disproportionately African American because the incarcerated population as a whole is disproportionately African American, and 95% of incarcerated people will eventually be released.[4]

47.     African Americans are incarcerated at rates significantly disproportionate to their numbers in the United States general population.  African Americans comprise approximately 34% of the incarcerated population but only 13% of the general population.[5]   Nationally, African Americans are incarcerated at between four-and-a-half to over seven times the rate of whites.[6]

**Table 1. Rates of Having Ever Been Imprisoned or Incarcerated for Black and White Americans by Various Ages and Black-White Disparities in Rates of Having Ever Been Imprisoned or Incarcerated by Various Ages Using Several Different Data Sources**

| Source | Black Rate (%) | White Rate (%) | Black/White Disparity |
|---|---|---|---|
| Bonzar (2003) (Men and women) | 18.6 | 3.4 | 5.47 |
| Bonczar (2003) (Men only) | 32.2 | 5.9 | 5.46 |
| Pettit and Western (2004) (Men only) | 20.5 | 2.9 | 7.07 |
| NLSY79 estimates (Men and women) | 10.6 | 2.4 | 4.44 |

48.     This disparity persists at the state and local levels.  In Louisiana, African Americans are incarcerated in state prisons at almost two-and-a-half times the rate of whites and are incarcerated in local jails at 1.6 times the rate of whites.  On the other hand, among those who receive any sort of sanction, whites are significantly more likely to receive probation than African Americans (44% vs. 30%).  Although these disparities are not as high as those at the national level,

---

[4] *See id.* at 1 (citations omitted).
[5] NAACP, *Criminal Justice Fact Sheet* (2021), https://naacp.org/resources/criminal-justice-fact-sheet.
[6] Christopher Wildeman, Black-White Disparities in Criminal Justice System Contacts in Jefferson Parish, Louisiana (2021); *see also* NAACP, *supra* note 5 ("African Americans are incarcerated at more than 5 times the rate of whites.").

reflecting Louisiana's lower racial disparities in incarceration relative to national data, they still indicate significant and substantial disparities in justice system contact.[7]

**Table 2. Rates of Custodial and Noncustodial Sanctions (per 100,000) for Blacks and Whites in Louisiana and Black-White Disparities in These Sanctions in Louisiana, 2021**

| Sanction | Black Rate | White Rate | Black/White Disparity |
|---|---|---|---|
| Prison Incarceration | 634 | 263 | 2.41 |
| Jail Incarceration | 548 | 340 | 1.61 |
| Parole | 124 | 53 | 2.32 |
| Probation | 876 | 896 | 0.98 |
| Electronic Monitoring | 725 | 445 | 1.63 |
| Any Sanction | 2,907 | 1,997 | 1.46 |

49.    However, the incarceration rates for Jefferson Parish track more closely to the national trend and in some instances exceed it.  Between 1990 and 2018, African Americans in Jefferson Parish were over six times as likely to be incarcerated as whites.  With the exception of 2005, the year of Hurricane Katrina, each year between 1990 and 2018 had a substantial disparity between the incarceration rates of African Americans and whites.  Further, in some years the disparity in incarceration rates exceeded a 10-to-1 ratio, and the disparity in recent years has persisted above the national average.[8]

---

[7] Wildeman, *supra* note 6.
[8] *Id.*

**Table 3: Local Jail Incarceration Rates (per 100,000) for Blacks and Whites in Jefferson Parish and Black/White Disparities in Local Jail Incarceration Rates in Jefferson Parish, 1990-2018**

| Year | Black Rate | White Rate | Black/White Disparity |
|------|-----------|-----------|----------------------|
| 1990 | 548 | 69 | 7.89 |
| 1991 | 467 | 91 | 5.14 |
| 1992 | 533 | 74 | 7.20 |
| 1993 | 454 | 91 | 4.96 |
| 1994 | 580 | 51 | 11.30 |
| 1995 | 507 | 69 | 7.32 |
| 1996 | 479 | 75 | 6.41 |
| 1997 | 454 | 80 | 5.65 |
| 1998 | 492 | 65 | 7.55 |
| 1999 | 433 | 83 | 5.23 |
| 2000 | 446 | 77 | 5.80 |
| 2001 | 437 | 78 | 5.58 |
| 2002 | 700 | 110 | 6.35 |
| 2003 | 681 | 122 | 5.60 |
| 2004 | 634 | 132 | 4.79 |
| 2005 | 307 | 265 | 1.16 |
| 2006 | 504 | 109 | 4.62 |
| 2007 | 381 | 150 | 2.55 |
| 2008 | 538 | 137 | 3.91 |
| 2009 | 589 | 89 | 6.60 |
| 2010 | 572 | 91 | 6.26 |
| 2011 | 614 | 82 | 7.47 |
| 2012 | 548 | 130 | 4.21 |
| 2013 | 611 | 52 | 11.78 |
| 2014 | 520 | 152 | 3.42 |
| 2015 | 669 | 79 | 8.46 |
| 2016 | 640 | 80 | 7.97 |
| 2017 | 636 | 81 | 7.84 |
| 2018 | 576 | 75 | 7.69 |
| Total | 536 | 98 | 6.23 |

50.     African Americans are also arrested at rates disproportionate to their share of the general population.  In 2019, African Americans comprised 26.6% of all individuals arrested in the United States – double their share of the total population.[9]  While comprehensive data is sparse, one analysis found that African Americans are 3.64 times more likely to be arrested for marijuana possession than whites, even though both groups use marijuana at similar rates.  Although this

---

[9] U.S. Dep't of Justice Federal Bureau of Investigation, *Crime in the United States, 2019* (2020), https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-43.

disparity was slightly lower in Louisiana overall as compared to the national average (3.35), it was significantly higher for Jefferson Parish, where African Americans are 4.9 times more likely to be arrested for marijuana possession than whites.[10]

51.     Thus, at the national, state, and local levels, African Americans are significantly more likely than whites to have a criminal record, meaning that African Americans are more likely than whites to be barred from housing by automatic exclusion of people with criminal records.

52.     The Equal Employment Opportunity Commission's ("EEOC") analysis of the impact of blanket bans in the employment context further confirms the disparate impact described here.  The EEOC has concluded from analyzing national criminal records data that blanket bans have a disparate impact on the basis of race and sets forth such a presumption in its Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964.[11]

53.     The EEOC's conclusion applies to the disparate impact analysis here because blanket bans operate the same way in housing as they do in employment.  In both contexts, applicants are uniformly and permanently excluded, whether from housing opportunities or employment.  They are excluded based solely on the fact of a prior conviction, regardless of whether they pose a current risk.

**B.     Defendant's Blanket Ban at Azalea Gardens Disproportionately and Severely Impacts African Americans in Jefferson Parish**

54.     Defendant's blanket ban at Azalea Gardens has a clear disparate impact on the basis of race.  In fact, the disparate impact is even more pronounced at the local level than at the national

---

[10] American Civil Liberties Union, A Tale of Two Countries: Racially Targeted Arrests in the Era of Marijuana Reform (2020), https://www.aclu.org/report/tale-two-countries-racially-targeted-arrests-era-marijuana-reform.

[11] U.S. Equal Emp't Opportunity Comm'n, No. 915.002, Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964 (2012), http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm.

or statewide level because incarceration rates for whites and African Americans are even more disproportionate in Jefferson Parish.

55.     Further compounding the issue is that African Americans in Jefferson Parish are more likely to be renters than whites.  Just over half of Jefferson Parish's population is white (52.6%) and just over a quarter is African American (26.4%).  While 38.8% of all households in Jefferson Parish are renters, 58.1% of African American households are renters, as compared to only 26.6% of white households.  Thus, African Americans in Jefferson Parish are more than twice as likely to be renters as whites.[12]

**Table 2:  Renters and Owners, Jefferson Parish, 2015-2019 American Community Survey**

|  | Total | White | Black |
|---|---|---|---|
| Households | 169,452 | 98,431 | 43,172 |
|  |  |  |  |
| Renters | 65,750 | 26,149 | 25,062 |
|  | 38.8% | 26.6% | 58.1% |
|  |  |  |  |
| Owner | 103,702 | 72,282 | 18,110 |
|  | 61.2% | 73.4% | 41.9% |

56.     Based on racial disparities in incarceration rates, whether at the national, state, or parish level, an absolute refusal to rent to anyone with any criminal conviction will significantly reduce the rental housing opportunities for African Americans in Jefferson Parish.  These significant effects on rental housing opportunities from racial disparities in incarceration rates are amplified in Jefferson Parish because the proportion of African American households that rent (58.1%) is more than double the proportion of white households that rent (26.6%).

---

[12] Allan M. Parnell, Racial Disparities in Incarceration and Racial Disparities in Rental Housing Opportunities in Jefferson Parish (2021).

C.   **Giving Individualized Consideration to Applicants' Circumstances Is A Less Discriminatory Alternative That Would Satisfy Any Concern About Safety at Azalea Gardens**

57.    Defendant's blanket ban is not necessary to achieve a legitimate nondiscriminatory business purpose.  While public safety may be Defendant's rationale for automatically excluding all people with criminal records from housing, blanket bans are not necessary to satisfy that concern.   Giving individualized consideration to each potential Azalea Gardens resident's circumstances is a less discriminatory alternative to Defendant's blanket ban and would serve public safety equally well.

58.    Specifically, public safety at Azalea Gardens can be protected through the use of individual assessments that consider the nature of an individual's conviction, the amount of time since the conviction or release, and evidence of rehabilitation, among other factors.   An individualized assessment allows people who have a criminal record, but who pose no realistic current or future threat to the community, to obtain housing.  This more targeted and narrower approach both protects public safety and is less discriminatory and exclusionary because it reduces the number of African American applicants who are banned from Azalea Gardens.

59.    HUD's 2016 Guidance states that "housing providers that apply a policy or practice that excludes persons with prior convictions must still be able to prove that such policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest.  A housing provider that imposes a blanket prohibition on any person with any convictions record – no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then – will be unable to meet this burden."[13]

---

[13] *Supra* note 2, at 6.

60.    HUD's Guidance continues: "A policy or practice that fails to take into account the nature and severity of an individual's conviction is unlikely to satisfy this standard.  Similarly, a policy or practice that does not consider the amount of time that has passed since the criminal conduct occurred is unlikely to satisfy this standard, especially in light of criminological research showing that, over time, the likelihood that a person with a prior criminal record will engage in additional criminal conduct decreases until it approximates the likelihood that a person with no criminal history will commit an offense."[14]

61.    HUD concluded that "a policy or practice that fails to consider the nature, severity, and recency of criminal conduct is unlikely to be proven necessary to serve a 'substantial, legitimate, nondiscriminatory interest' of the provider."[15]

62.    Defendant's application of its criminal background policy amounts to a blanket prohibition and fails to comply with this HUD Guidance.

63.    HUD further states that "individualized assessment of relevant mitigating information beyond that contained in an individual's criminal record is likely to have a less discriminatory effect than categorical exclusions that do not take such additional information into account.  Relevant individualized evidence might include: the facts or circumstances surrounding the criminal conduct; the age of the individual at the time of the conduct; evidence that the individual has maintained a good tenant history before and/or after the conviction or conduct; and evidence of rehabilitation efforts."[16]

64.    In the analogous employment context, the EEOC recognizes that individualized assessments are almost always required by law because they provide a less discriminatory

---

[14] *Id.* at 7 (citations omitted).
[15] *Id.*
[16] *Id.*

alternative to blanket bans and are sufficient to protect legitimate interests like safety.  The EEOC's Enforcement Guidance advocates the use of a "a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job," "notice to the individual that he has been screened out because of a criminal conviction; an opportunity for the individual to demonstrate that the exclusion should not be applied due to his particular circumstances; and consideration by the employer as to whether the additional information provided by the individual warrants an exception to the exclusion and shows that the policy as applied is not job related and consistent with business necessity."[17]

65.     The EEOC's sound rationale applies equally to housing, including housing at Azalea Gardens.

66.     It would not compromise any legitimate concern the Defendant may have to give individualized consideration to applicants' particular circumstances and allow those who do not threaten public safety to live at Azalea Gardens.  Defendant's blanket criminal history ban at Azalea Gardens nonetheless prevents any individualized consideration.  Defendant's policy of automatically excluding people with criminal records is not necessary to achieve a legitimate business purpose.

67.     Because Defendant's blanket ban has a large discriminatory impact on the basis of race and is not necessary to achieve a legitimate business purpose, it is unlawfully discriminatory.

## INJURY TO LAFHAC

68.     LaFHAC's efforts in furtherance of its mission have been directly harmed by Defendant's discrimination against individuals on the basis of race and disability.

---

[17] *Supra* note 11.

69.     After the initial testing that occurred within an audit investigation of the New Orleans-area rental market, the focused investigation of Azalea Gardens to identify and confirm Defendant's discriminatory rental practices involved the commitment of LaFHAC's time and resources.

70.     Among other investigative actions, LaFHAC's Coordinator of Investigations and auxiliary staff created the testers' rental profiles, coordinated the tests, and analyzed and summarized the numerous calls and site visits.  LaFHAC further expended funds to compensate the testers for the specific tests they undertook at Azalea Gardens.

71.     In order to undertake the testing investigation, LaFHAC diverted its investigative resources from other investigative projects and activities in furtherance of its mission.  The diversion of resources occasioned by Defendant's discriminatory conduct impaired or impeded these projects and activities.

72.     LaFHAC also dedicated resources to counteracting the effects of Defendant's discrimination in the community.  Such resource expenditure included LaFHAC's dedication of staff time and organizational funds to engage in education and outreach activities narrowly targeted to counteract the Defendant's specific discriminatory practices.

73.     The education and outreach activities undertaken to counter the specific discriminatory practices undertaken by Defendant included the creation and geographically targeted distribution of materials addressing race, color, and disability discrimination, social media and website posts addressing race and familial discrimination, working with community partners to best reach the communities affected by the discrimination, and participation in community events in the affected community to provide education regarding fair housing rights.

74.     As a result of these counteraction efforts, which are ongoing and made specifically in response to Defendant's conduct as alleged herein, LaFHAC has diverted its resources away from other planned projects and activities in furtherance of its mission.  Those planned projects and activities included LaFHAC's annual fair housing conference, recruitment of sponsors for LaFHAC community events, fair housing training events for landlords, and other projects and activities.  The diversion of resources occasioned by Defendant's discriminatory conduct impaired or impeded these projects and activities.

75.     With respect to the conduct alleged above, Defendant acted with willful disregard, malice, or reckless indifference that its actions violated the Fair Housing Act.

## CAUSES OF ACTION

## COUNT I

## Race Discrimination under the Fair Housing Act, 42 U.S.C. § 3604

76.     LaFHAC realleges and incorporates herein by reference the allegations set forth above.

77.     Defendant's acts, policies, and practices have an adverse and disproportionate impact on African Americans in Jefferson Parish as compared to similarly situated whites.  This adverse and disproportionate impact is the direct result of Defendant's policy of automatically refusing housing to all people with criminal records with no consideration of their individual characteristics and circumstances.  This policy is not necessary to serve any substantial legitimate, nondiscriminatory interest, and any such interest can be satisfied by another practice – providing individualized consideration – that would have a less discriminatory effect.

78.     Defendant's acts, policies, and practices constitute discrimination and violate the Fair Housing Act, as amended, 42 U.S.C. § 3604, and its implementing regulations, in that:

a.  Defendant's acts, policies, and practices have made and continue to make housing unavailable because of race, in violation of 42 U.S.C. § 3604(a);

b.  Defendant's acts, as described above, provide different terms, conditions, and privileges of rental housing, as well as different services and facilities in connection therewith, on the basis of race, in violation of 42 U.S.C. § 3604(b); and

c.  Defendant's notices and statements have expressed and continue to express a preference, limitation, and discrimination based on race, in violation of 42 U.S.C. § 3604(c).

79.     With respect to the conduct alleged above, Defendant acted with willful disregard, malice, or reckless indifference that its actions violated the Fair Housing Act.

80.     Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), has been injured by Defendant's discriminatory conduct, and has suffered damages as a result.

81.     Accordingly, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c).

## COUNT II

### Disability Discrimination under the Fair Housing Act, 42 U.S.C. § 3604

82.     LaFHAC realleges and incorporates herein by reference the allegations set forth above.

83.     By the conduct set forth above, Defendant:

a.  discriminated in the rental of, or otherwise made unavailable, a dwelling because of disability, in violation of 42 U.S.C. § 3604(f)(1);

    b.   discriminated in the privileges of the rental of a dwelling because of disability, in violation of 42 U.S.C. § 3604(f)(2);

    c.   made or caused to be made a statement with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on disability, in violation of 42 U.S.C. § 3604(c); and

    d.   refused to make reasonable accommodations in rules, policies, practices or services, when such accommodations were necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. §3604(f)(3)(B).

84.     With respect to the conduct alleged above, Defendant acted with willful disregard, malice, or reckless indifference that its actions violated the Fair Housing Act.

85.     Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), has been injured by Defendant's discriminatory conduct, and has suffered damages as a result.

86.     Accordingly, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to the Fair Housing Act, 42 U.S.C. § 3613(c).

## PRAYER FOR RELIEF

**WHEREFORE**, LaFHAC prays that the Court award the following relief:

A.     Enter a declaratory judgment that the discriminatory conduct of Defendant set forth above violated the Fair Housing Act;

B.     Enter an injunction against Defendant and its agents, employees, successors, and all other persons in active concert or participation with them that:

i.   enjoins them from discriminating on the basis of race and disability in violation
of the Fair Housing Act;

ii.   requires them to take affirmative steps to prevent the recurrence of
discriminatory conduct in the future, including training, implementation of non-
discrimination policies and procedures, reporting requirements, and any other
steps that may be necessary;

C.     Award Plaintiff compensatory damages for diversion of resources and frustration
of mission;

D.     Award Plaintiff punitive damages for Defendant's willful, malicious, wanton, and
reckless conduct alleged herein, that would effectively deter similar conduct in the future;

E.     Award Plaintiff its reasonable attorneys' fees and costs incurred in this action; and

F.     Award any additional relief that is just and proper.

Respectfully Submitted,

*/s/ Cashauna Hill*
Cashauna Hill, La. Bar #34385
LOUISIANA FAIR HOUSING
ACTION CENTER, INC.
1340 Poydras Street, Suite 710
New Orleans, LA 70112
Phone: (504) 708-5671
Email: chill@lafairhousing.org

*/s/ Perry Graham*
Perry Graham, La. Bar #38241
LOUISIANA FAIR HOUSING
ACTION CENTER, INC.
1340 Poydras Street, Suite 710
New Orleans, LA 70112
Phone: (504) 708-2130
Email: pgraham@lafairhousing.org
***Counsel for Plaintiff***