# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 14, 2023

Lyle W. Cayce
Clerk

———————

No. 22-30609

———————

LOUISIANA FAIR HOUSING ACTION CENTER, INCORPORATED,

*Plaintiff—Appellee,*

*versus*

AZALEA GARDEN PROPERTIES, L.L.C.,

*Defendant—Appellant.*

———————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:22-CV-74

———————————————

Before ELROD, HO, and WILSON, *Circuit Judges.*

CORY T. WILSON, *Circuit Judge*:

Louisiana Fair Housing Action Center (LaFHAC) sued Azalea Garden Properties, LLC (Azalea Garden), alleging that Azalea Garden discriminated on the basis of race and disability at its apartment complex in Jefferson, Louisiana, in violation of the Fair Housing Act (FHA). The district court dismissed LaFHAC's disability claim, but allowed its disparate impact race claim to proceed, subject to one caveat: The district court certified a permissive interlocutory appeal on the issue of whether the "predictably will cause" standard for FHA disparate-impact claims remains viable after *Inclusive Communities Project Inc. v. Lincoln Property Co.*, 920 F.3d

890 (5th Cir. 2019). Before reaching that question, however, we are duty-bound to consider the threshold issue of jurisdiction, and specifically whether LaFHAC has standing to bring the underlying claims. Concluding that it does not, we remand with instruction to dismiss this action.

## I.

LaFHAC "is a nonprofit entity with a mission to eradicate housing discrimination in Louisiana."[1] LaFHAC employs "testers" to ferret out discrimination. Per LaFHAC, these testers "pose as prospective residents . . . to obtain information" from "housing providers" "to determine if the provider is discriminating in violation of the FHA." LaFHAC "tested" Azalea Garden's complex in this way over several years beginning in 2015.

In June 2015, the first LaFHAC tester (identified as "MW") called the complex "to inquire about units available for rent." MW connected with Heidi, an agent at the complex, and arranged to tour a model unit. After Jordan, another Azalea Garden employee, showed MW the unit, MW asked "how a seven-year-old misdemeanor would affect her odds of being approved to rent" a unit at the complex. Unsure of the answer, Jordan deferred to another Azalea Garden employee, Danielle, who told MW that such a misdemeanor would affect her odds "[i]f it shows up." During her visit, MW received a copy of Azalea Garden's rental application, which included a written policy regarding the complex's use of criminal background checks in reviewing rental applications:

> If the criminal background check reveals any of the following, it will be grounds for rejecting an application: [a]ny [m]isdemeanor conviction in the preceding five (5) years

---

[1] The facts and quotations in this section are drawn from LaFHAC's complaint.

No. 22-30609

including but not limited to a person or property misdemeanor; [a]ny [f]elony convictions (with no time limit); . . . [a]ny drug related convictions, including petty offenses; . . . [and] [a]ny of the above related charges resulting in "Adjudication withheld" and/or "deferred Adjudication."

Over the next several years, four other LaFHAC testers contacted the complex. Each tester inquired as to whether a criminal history would cause an application to be declined. Heidi and other Azalea Garden agents consistently responded that a past criminal history would cause the automated computer system to reject an application and that the agents had little discretion in the matter.

LaFHAC sued Azalea Garden, alleging housing discrimination under a disparate impact theory. Per LaFHAC, despite Azalea Garden's written policy on past criminal history, Azalea Garden's de facto policy is to deny all applicants with any criminal history, regardless of any individualized variables. LaFHAC alleges that this de facto policy has a disparate impact on African Americans because, at the national, state, and local levels, African Americans are more likely than whites to have a criminal record. Therefore, African Americans are more likely to be denied housing under a policy that automatically declines would-be renters with criminal records.

Azalea Garden moved to dismiss, asserting that the dispute was not ripe and that LAFHAC had failed to allege a racial disparity that was caused by Azalea Garden's criminal-history policy. LaFHAC countered that Azalea Garden's employees should be expected to convey the complex's criminal history policy accurately and that the criminal history data included in its complaint permitted a reasonable inference that Azalea Garden's blanket ban creates a racial disparity at the complex. LaFHAC maintained that it has organizational standing to pursue its claims.

No. 22-30609

The district court granted in part and denied in part Azalea Garden's motion to dismiss. The court determined that LaFHAC's claims were ripe and held that "the plaintiff ha[d] alleged a prima fac[i]e case of disparate impact that includes a policy of the defendant that predictably will cause a discriminatory effect." *La. Fair Hous. Action Ctr. v. Azalea Garden Props., LLC*, No. CV 22-74, 2022 WL 1262642, at *6 (E.D. La. Apr. 28, 2022). The court did not explicitly address LaFHAC's standing.

Azalea Garden moved for reconsideration or, in the alternative, for certification of a permissive interlocutory appeal under 28 U.S.C. § 1292(b). The district court granted the alternative request, ruling that

> the denial of the race-based disparate impact claim involves a controlling question of law, i.e., whether the "predictably will cause" standard survives the [*Lincoln Property*] decision, as to which there is substantial ground for difference of opinion, and that an immediate appeal from the order will materially advance the ultimate termination of the litigation.

*La. Fair Hous. Action Ctr. v. Azalea Garden Props., LLC*, No. CV 22-74, 2022 WL 2165415, at *1 (E.D. La. June 9, 2022). We likewise granted leave to appeal.

In this court, the parties and amici treat this case as a vehicle for us to clarify the "robust causality" requirement for disparate impact claims under the FHA. *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015); *see also Inclusive Cmtys. Project v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019), *reh'g en banc denied*, 930 F.3d 660 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2506 (2020). Indeed, the district court's certification focused on that issue. However, before considering the

No. 22-30609

question, we must have jurisdiction to do so.[2]  Because we conclude that LaFHAC lacks standing to bring its claims, we may not reach the underlying merits.

## II.

We "review standing *de novo*."  *Tex. State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022) (citation omitted).  When reviewing standing "on the basis of the pleadings, we must accept as true all material allegations of the complaint and . . . construe the complaint in favor of the complaining party."  *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quotations and citations omitted).  Still, the plaintiff must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotations and citations omitted).

## III.

Organizations may sue both in their own right and on behalf of their members, and often do.  But because LaFHAC does not have members,[3] its

---

[2] Though the district court's order did not explicitly analyze LaFHAC's standing, we must consider the question because "the requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *see also Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 799 (5th Cir. 2012) ("Every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the [district] court[] in a cause under review, even [if] the parties are prepared to concede it." (citation and quotation marks omitted)).

[3] If LaFHAC had members, it could have standing "[e]ven in the absence of injury to itself[.]" *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 550 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).  That is because LaFHAC could "have standing solely as the representative of" any members who themselves suffered an injury and "have standing to sue in their own right." *Id.* (quoting both *Warth*, 422 U.S. at 511, and *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

claims here are grounded only on its alleged organizational standing. An organization "can establish standing in its own name if it meets the same standing test that applies to individuals." *OCA-Greater Houston v. Tex.*, 867 F.3d 604, 610 (5th Cir. 2017) (citation and quotation marks omitted). An organization suing under the FHA must meet the familiar tripartite test prescribed in *Lujan*:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. at 560–61 (citations and footnote omitted, alterations in original); *see La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 304 (5th Cir. 2000). LaFHAC falters on the first prong, injury-in-fact, so we need not tarry on the others.

An organization may establish a cognizable injury by showing that its "ability to pursue its mission is 'perceptibly impaired' because it has 'diverted significant resources to counteract the defendant's conduct[.]'" *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) (quoting *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)). However, not every diversion of resources rises to an injury sufficient to confer standing. *City of Kyle*, 626 F.3d at 238. The organization's purportedly injurious counteractions must "'differ from its routine [] activities.'" *Tenth St. Residential Ass'n*, 968 F.3d at 500 (alterations in original) (quoting *City of Kyle*, 626 F.3d at 238). And expenses that are

substantively related to future litigation do not suffice. *OCA-Greater Houston*, 867 F.3d at 612.

In its complaint, LaFHAC pleads several distinct organizational injuries, of a theme that LaFHAC was forced to divert resources to counteract Azalea Garden's alleged discriminatory rental policy. The alleged diversions fall into three basic categories: (1) expenditures from its investigation of the complex, (2) expenditures from "narrowly targeted" "education and outreach activities," and (3) the diversion of resources away from other planned activities. None of the three suffices to establish an injury to support LaFHAC's organizational standing.

First, LaFHAC alleges that after its initial audit investigation, it performed a "focused investigation of Azalea Garden[] to identify and confirm Defendant's discriminatory rental practices[, which] involved the commitment of LaFHAC's time and resources." Per paragraph 70 of the complaint, to facilitate that testing, "LaFHAC's Coordinator of Investigations and auxiliary staff created the testers' rental profiles, coordinated the tests, and analyzed and summarized the numerous calls and site visits. LaFHAC further expended funds to compensate the testers for the specific tests they undertook at Azalea Garden[]." Paragraph 71 alleges that as a result, "LaFHAC diverted its investigative resources from other investigative projects and activities in furtherance of its mission. The diversion of resources occasioned by Defendant's discriminatory conduct impaired or impeded these projects and activities."

This ground for standing quickly falls out of the mix. Any diversion of resources caused by LaFHAC's use of testers to investigate Azalea Garden cannot be a cognizable injury. The investigation does not "differ from its routine [] activities" in the slightest—using testers to investigate *is* its routine activity. As LaFHAC explained in its complaint, "[t]o achieve [its]

mission, LaFHAC engages in testing and other investigations of housing discrimination. It employs 'testers,' ... to obtain information about the conduct of housing providers for the purposes of determining if housing discrimination is taking place." Thus, LaFHAC's use of testers and the expenses associated with its "investigations of housing discrimination" are not, without more, cognizable injuries. *See Tenth St. Residential Ass'n*, 968 F.3d at 500 (citation omitted). Moreover, to the extent that LaFHAC's "focused investigation ... to ... confirm Defendant's discriminatory rental practices" was in preparation for this litigation, those expenses cannot supply an injury for standing. *OCA-Greater Houston*, 867 F.3d at 611 (discussing *City of Kyle* and noting "fundamental" principle that "no plaintiff may claim as injury the expense of preparing for litigation").

Second, LaFHAC alleges that it:

72. ... also dedicated resources to counteracting the effects of Defendant's discrimination in the community. Such resource expenditure included LaFHAC's dedication of staff time and organizational funds to engage in education and outreach activities narrowly targeted to counteract the Defendant's specific discriminatory practices.

73. The education and outreach activities undertaken to counter the specific discriminatory practices undertaken by Defendant included the creation and geographically targeted distribution of materials addressing race, color, and disability discrimination, social media and website posts addressing race and familial discrimination, working with community partners to best reach the communities affected by the discrimination, and participation in community events in the affected community to provide education regarding fair housing rights.

These education and outreach efforts present a closer call but ultimately prove insufficient to substantiate standing for similar reasons. During oral argument, LaFHAC conceded that its "education and outreach

staff" takes "appropriate counteraction" whenever LaFHAC determines that a housing provider is engaging in discriminatory housing practices, regardless of whether LaFHAC pursues legal action.[4]  That concession shows that LaFHAC's "appropriate counteraction" efforts seemingly fall squarely within its routine activities undertaken to fulfill its mission "to eradicate housing discrimination in Louisiana"—LaFHAC has dedicated "education and outreach staff" to carry out those efforts, after all.  Even without that concession though, LaFHAC has not pled facts sufficient to show that its "ability to carry out its mission [was] 'perceptibly impaired' because it has 'diverted significant resources'" to these education and outreach efforts. *Tenth St. Residential Ass'n*, 968 F.3d at 500 (quoting *City of Kyle*, 626 F.3d at 238).  Of course, shifting resources *to* these efforts seems less likely to give rise to injury without corresponding allegations of what LaFHAC had to shift resources *away from* as a result.

So we turn to LaFHAC's third alleged type of injury.  LaFHAC alleges that its counteractions of Azalea Garden's policy required it to divert resources "away from other planned projects and activities in furtherance of its mission."  Paragraph 74 of the complaint details that "[t]hose planned projects and activities included LaFHAC's annual fair housing conference, recruitment of sponsors for LaFHAC community events, fair housing training events for landlords, and other projects and activities."  This alleged injury comes closest to substantiating standing.  But it still does not cross the threshold.

Here, LaFHAC has plausibly alleged a diversion of resources, as it shifted efforts away from planned projects like its annual conference toward

---

[4] Oral Argument at 22:20–23:05, *LaFHAC v. Azalea Garden, LLC* (No. 22-30609), http://www.ca5.uscourts.gov/oral-argument-information/oral-argument-recordings.

counteracting Azalea Garden's alleged discrimination. But "an organization does not automatically suffer a cognizable injury in fact by diverting resources in response to a defendant's conduct." *El Paso Cnty. v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020).[5] Rather, the Article III injury comes when "that diversion of resources . . . concretely and 'perceptibly impair[s]' the [organization's] ability to carry out its purpose." *City of Kyle*, 626 F.3d at 239 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also El Paso Cnty.*, 982 F.3d at 343 (same); *Tenth St. Residential Ass'n*, 968 F.3d at 500 (same); *OCA-Greater Houston*, 867 F.3d at 612 (same). Put differently, the "perceptible impair[ment]" to an organization's ability to carry out its mission, not the "drain on the organization's resources," is the "concrete and demonstrable injury" for organizational standing. *Havens*, 455 U.S. at 379. LaFHAC fails to plead an injury because it fails to allege how its diversion of resources impaired its ability to achieve its mission.

To be sure, LaFHAC points to three specific projects that were affected by the alleged diversion: its "annual fair housing conference, recruitment of sponsors for [its] community events, and fair housing training events for landlords[.]" Though it has "identified . . . specific projects," LaFHAC fails to allege that it had to put those projects "on hold or otherwise curtail [them] in order to respond" to Azalea Garden's alleged discriminatory practices. *City of Kyle*, 626 F.3d at 238.

LaFHAC conclusorily alleges that "[t]he diversion of resources occasioned by Defendant's discriminatory conduct impaired or impeded these projects and activities." But it nowhere explains how any of these

---

[5] At oral argument, LaFHAC seemed to indicate that the diversion of resources alone constituted an injury. *See* Oral Argument at 19:36–20:51, *LaFHAC v. Azalea Garden, LLC* (No. 22-30609), http://www.ca5.uscourts.gov/oral-argument-information/oral-argument-records. Such an assertion is inconsistent with our precedent.

activities were canceled, postponed, or "otherwise curtail[ed]." *Id.* Such a threadbare allegation that the projects were "impaired" is insufficient for injury, even at the motion to dismiss stage. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–81 (2009) (requiring more than "conclusory statements" or "threadbare recitals of the elements" to survive a motion to dismiss).

Nor does LaFHAC explain how any curtailment of these projects perceptibly impaired its ability to achieve its mission. On their face, the efforts taken to counteract alleged discrimination at Azalea Garden would appear to advance, rather than impair, LaFHAC's mission of eradicating housing discrimination. And as we have explained, those efforts likely fall within the ambit of LaFHAC's routine activities. Nothing in the complaint permits an inference that the diversion impaired LaFHAC's ability to achieve its mission. Even "accept[ing] as true all material allegations of the complaint and . . . constru[ing] the complaint in favor of" LaFHAC, *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 550, we fail to see how LaFHAC has carried its burden clearly to "allege facts demonstrating" that it suffered an injury by virtue of its diversion of resources, *Spokeo*, 578 U.S. at 338.

In the district court, LaFHAC relied on *OCA-Greater Houston* in asserting it had standing. But that case is distinguishable. In *OCA-Greater Houston*, an organization whose mission was "voter outreach and civic education" challenged a Texas law restricting English-limited voters' use of interpreters at the polls. 867 F.3d at 610. The challenged law forced OCA to spend more time explaining the law in each conversation, voter by voter, which "frustrate[d] and complicate[d] its routine community outreach activities," and reduced the number of people that it could speak to on a given day. *Id.* (internal quotations omitted). Because OCA could "reach fewer people in the same amount of time," *id.*, we found that "the Texas statutes at issue 'perceptibly impaired' OCA's ability" to achieve its mission

No. 22-30609

of getting out the vote, *id.* at 612 (quoting *Havens Realty*, 455 U.S. at 379). We held this to be an injury supporting Article III standing. *Id.*

The same does not hold true here. LaFHAC fails to allege that its activities in response to Azalea Garden's alleged discrimination perceptibly impaired its mission. That is the difference between today's case and *OCA-Greater Houston*: OCA's diversion perceptibly impaired the effectiveness of OCA's efforts to further its mission because OCA was able to reach fewer voters, while LaFHAC has not plausibly alleged that its diversion of resources meant it could reach fewer people or otherwise be less successful in achieving its mission.

Nor does *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982), help LaFHAC. There, plaintiffs alleged that Havens Realty, the owner and operator of two apartment complexes in Virginia, had engaged in illegal racial steering by falsely denying availability of apartments to African American rental applicants while giving contrary information to white applicants. *Id.* at 368. One of the plaintiffs (Housing Opportunities Made Equal (HOME)), like LaFHAC, employed testers and alleged it had organizational standing to sue Havens for violating the FHA.[6] *Id.* at 368–69. HOME alleged that its efforts to promote equal access to housing through counseling and other referral services were "perceptibly impaired" by the defendant's discriminatory steering practices. *Id.* at 379. The Supreme Court concluded that this constituted a "concrete and demonstrable injury" sufficient for Article III standing at the motion-to-dismiss stage. *Id.*

---

[6] Unlike LaFHAC, HOME was also a membership association with approximately 600 members. *Id.* at 368. In addition to grounding its claims on a theory of organizational standing, HOME also sued on behalf of its members. *Id.* at 369. It later abandoned its associational standing argument, so the Court decided only whether HOME had organizational standing. *Id.* at 378.

No. 22-30609

Key to the Court's holding were the counseling and referral services HOME offered to low-income rental applicants. HOME's provision of those services was perceptibly impaired by Havens's discriminatory practices: After all, HOME could not place African American clients into housing at Havens's complex when Havens was engaged in illegal racial steering. Moreover, HOME plausibly was able to counsel and place fewer clients in housing because of its diversion of resources to counteract the defendant's discriminatory practices. Accordingly, like OCA, HOME sufficiently alleged impairment of its mission because it could assist fewer individuals. By contrast—and to the extent that LaFHAC's alleged activities countering Azalea Garden's alleged discrimination fall outside its routine mission at all—LaFHAC alleges no "concrete and demonstrable" injury in terms of fewer clients referred or prospective tenants reached. *Havens Realty* is thus inapt to support LaFHAC's standing in this case.[7]

In sum, juxtaposing our precedent against LaFHAC's allegations, LaFHAC has failed to allege an Article III injury. We forecast no opinion as to whether, should LaFHAC replead its claims anew, it can substantiate a perceptible impairment to its ability to achieve its mission because of Azalea Garden's alleged discriminatory practices. *Cf. Griener v. United States*, 900 F.3d 700, 705 (5th Cir. 2018) ("[D]ismissal for want of jurisdiction" is "without prejudice to the plaintiff's claims.") (citation omitted). We simply hold that "diverting" resources from one core mission activity to another,

---

[7] The same is true of *Inclusive Communities Project, Inc. v. Lincoln Property Co.*, 920 F.3d 890 (5th Cir. 2019). There, plaintiff Inclusive Communities Project, Inc. (ICP) "provide[d] counseling, financial assistance, and other services to Black or African American households participating in the [federal] Section 8 Housing Choice Voucher . . . Program[.]" 920 F.3d at 895. Thus, ICP had standing to challenge Lincoln Property's alleged discrimination against voucher recipients because Lincoln Property's discrimination impaired ICP's "ability to assist its voucher clients in obtaining dwellings[.]" *Id.* at 896.

i.e., prioritizing which "on-mission" projects, out of many potential activities, an entity chooses to pursue, does not suffice—organizations daily must choose which activities to fund, staff, and prioritize. Nor do conclusory allegations that an organization's diversion of resources "impaired or impeded" some planned projects. To plead an Article III injury at the motion-to-dismiss stage, an organization must go beyond the talismanic words to allege facts showing its ability to achieve its mission was "perceptibly impaired" such that it suffered a concrete and demonstrable injury.[8]

## IV.

Because LaFHAC has not alleged a cognizable injury, it lacks standing to bring the claims it alleges in this action. Therefore, the district court lacked jurisdiction over this case, and we likewise cannot consider the district court's certified question. We therefore pretermit further discussion of the issue presented and REMAND this case with instruction to DISMISS LaFHAC's claims without prejudice.

---

[8] To be clear, our holding does not diminish the ability of housing organizations to bring suits under the FHA. To the contrary, we reaffirm that such organizations can establish standing to sue where they have suffered an injury in fact. *See Havens Realty*, 455 U.S. at 379; *see also OCA-Greater Houston*, 867 F.3d at 612. Moreover, if they have members, such organizations may also be able to sue on behalf of one or more members who have suffered an injury. *See supra* n.3. And of course, such organizations may also assist individual plaintiffs who themselves have standing in prosecuting such lawsuits.

No. 22-30609

James C. Ho, *Circuit Judge*, concurring:

Based on how this case has been pleaded and presented to date, the Louisiana Fair Housing Action Center lacks standing to sue. I write separately to make two brief points.

## I.

The majority goes out of its way to observe that the Center could "replead its claims anew" in a manner that would "substantiate a perceptible impairment to its ability to achieve its mission because of Azalea Garden's alleged discriminatory practices" and thereby establish standing. *Ante*, at 13. *See, e.g.*, *Lopez v. Pompeo*, 923 F.3d 444, 447 (5th Cir. 2019) ("A dismissal for lack of jurisdiction . . . does not operate as an adjudication on the merits. The dismissal permits a second action on the same claim that corrects the deficiency found in the first action.") (cleaned up); *Hughes v. United States*, 71 U.S. 232, 237 (1866) ("If the first suit was dismissed for . . . want of jurisdiction . . . the judgment rendered will prove no bar to another suit.").

I highlight this statement for a few reasons. To begin with, it reaffirms that there's nothing improper about a court making this observation. To the contrary, it's entirely consistent with the judicial function to provide guidance to litigants on the proper scope and availability of judicial review. *See, e.g.*, *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 941 n.2 (5th Cir. 2022) (Ho, J., concurring in the judgment) (citing *California v. Texas*, 141 S. Ct. 2104, 2135 n.9 (2021) (Alito, J., dissenting)).

Moreover, it's an observation that may well benefit the Center. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court found standing for an organization dedicated to promoting fair housing to challenge a defendant's allegedly discriminatory housing practices. But that's because the organization's activities "included the operation of a housing counseling service." *Id.* at 368. And the organization alleged that

the defendant's discriminatory practices "impaired [its] ability to provide counseling and referral services for low- and moderate-income home-seekers." *Id.* at 379. That's "far more than simply a setback to the organization's abstract social interests." *Id.* The alleged discrimination harmed its ability to serve its clients—and thus inflicts "concrete and demonstrable injury" on the organization. *Id.*

That's fundamentally different from the injuries alleged here. It's a basic tenet of our Article III jurisprudence that plaintiffs cannot assert standing based on "self-inflicted" injury. *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 541 (5th Cir. 2019) (noting "the general rule that 'standing cannot be conferred by a self-inflicted injury'"); *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("standing cannot be conferred by a self-inflicted injury"); *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) ("An organization cannot obtain standing to sue in its own right as a result of self-inflicted injuries").[1]

So a plaintiff can't establish standing simply by choosing to expend resources in response to conduct it disagrees with, and calling that injury. *See, e.g.*, *Fair Emp. Council of Greater Washington v. BMC Mtkg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) ("The diversion of resources to testing might well harm the [plaintiff's] other programs, for money spent on testing is money that is not spent on other things. But this particular harm is self-

---

[1] We've repeatedly adhered to this principle because the Supreme Court has told us to. *See, e.g.*, *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) ("The injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures. . . . No State can be heard to complain about damage inflicted by its own hand."); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) ("respondents cannot manufacture standing merely by inflicting harm on themselves") (citing *Nat'l Family Plan. and Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing.")).

inflicted; it results not from any actions taken by [the defendant], but rather from the [plaintiff's] own budgetary choices.").

It's incumbent on courts, then, to police the line between actual injury and self-inflicted injury—between bona fide harm and budgetary discretion.

The majority dutifully applies existing precedent to conclude that the Center lacks standing. I agree.

I would conceptualize the analysis this way: Rather than focus on what a plaintiff has done *in response* to a defendant's conduct, we instead ask: Will the plaintiff will be injured if it *does nothing*?

If the answer is yes, then the plaintiff has standing—and if the answer is no, then it doesn't. If someone punches you in the nose, you have standing against your assailant, whether you end up going to the hospital or not. And if someone else is punched in the nose, you don't have standing just because you chose to go to the hospital to show support for the victim.

So it's not enough that a defendant's discriminatory practices motivates an organization to take action in response. After all, if the mere voluntary diversion of resources was enough to establish standing, then any public interest law firm would always have automatic standing to bring suit. But we know that's not right. *See*, *e.g.*, *OCA-Greater Houston v. Texas*, 867 F.3d 604, 611 (5th Cir. 2017) ("no plaintiff may claim as injury the expense of preparing for litigation"); *Fair Emp. Council*, 28 F.3d at 1277 ("By this logic, the time and money that [a law firm] spend[s] in bringing suit against a defendant would itself constitute a sufficient 'injury in fact', a circular position that would effectively abolish the requirement altogether."). You might as well just allege injury to your social or political objectives—such as your desire for a particular law to be obeyed. And we know that's not right either. "Article III requires more than a desire to vindicate value interests." *Diamond v. Charles*, 476 U.S. 54, 66 (1986).

That's the problem with the claim of standing here. The Center alleges that Azalea Garden negatively impacted the causes it believes in, and that in response, the Center chose to expend resources to counteract those negative social effects. But harm to cause is not harm to plaintiff.

By contrast, if a defendant's practices make it more difficult or costly for an organization to conduct its operations, then the organization may well have standing. *See*, *e.g.*, *Havens Realty*, 455 U.S. at 379 ("If . . . [defendant's] steering practices have perceptibly impaired [plaintiff's] ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."); *Fair Emp. Council*, 28 F.3d at 1276 (finding standing where "[the defendant's] alleged pattern of discrimination . . . has made the [plaintiff's work] more difficult").

The problem here is that the Center hasn't alleged how anyone has made it more difficult to conduct its operations. So it lacks standing. But that would not prevent them from making such allegations in a future case.

## II.

There's another way the Center could cure its standing problems. The Center has no members. *Ante*, at 5; *id.* at 5 n.3. But that wouldn't prevent it from joining other plaintiffs who are injured by the alleged practices. *See*, *e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit.").

Any person denied housing for discriminatory reasons, for example, would have standing. *Id.* at 264. In addition, any person already in the neighborhood may be able to establish standing if the discrimination denies him the opportunity to "liv[e] in an integrated community"—a concept the

Court called "neighborhood" standing. *Havens Realty*, 455 U.S. at 375. In *Havens Realty*, two individuals alleged that "the racial steering practices of [the defendants] . . . deprived them of 'the right to the important social, professional, business and economic, political and aesthetic benefits of interracial associations that arise from living in integrated communities free from discriminatory housing practices.'" *Id.* at 376. The Court appeared to credit this theory of standing, noting that even the defendants "do not dispute that the loss of social, professional, and economic benefits resulting from steering practices constitutes palpable injury." *Id.* at 377.[2]

---

[2] Although *Havens Realty* recognized this theory of standing, it didn't credit the plaintiffs' specific claim of "aesthetic" injury. *Compare id.* at 376, *with id.* at 377. That's not surprising—established precedent recognizes aesthetic injury, but only in the context of animals and the environment. *See, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992) ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.").

So a plaintiff can claim aesthetic injury when it comes to biodiversity, but not racial diversity. That's presumably because, unlike humans, "animals lack standing to sue in their own right." Cass R. Sunstein, *Standing for Animals (with Notes on Animal Rights)*, 47 UCLA L. Rev. 1333, 1335 (2000). *See also* Jeffrey M. Skopek, *Aesthetic Injuries, Animal Rights, and Anthropomorphism*, 122 Harv. L. Rev. 1204, 1206 (2009) (same). As one respected scholar has explained, "species, ecosystems, and embryos are not legal persons who can suffer cognizable harm." Heather Elliott, *Standing Lessons: What We Can Learn When Conservative Plaintiffs Lose Under Article III Standing Doctrine*, 87 Ind. L.J. 552, 597 (2012). So "the environmental plaintiff or stem cell opponent [must] argue her own standing." *Id.* (Professor Elliott lists unborn human life alongside animal life because environmental plaintiffs are "very similar" to pro-life plaintiffs. *Id.* at 584. *See also id.* at 585 (analogizing "environmental plaintiffs" to "pro-life litigants" "for purposes of standing" and concluding that "it would not actually be very hard, legally, to recognize embryos"); *id.* at 597 ("Just as the environmental plaintiffs sue to protect the endangered species or the ecosystem, the stem cell opponents sue to protect embryos.").)

Whether the doctrine of aesthetic injury makes any sense or not is, of course, an entirely different question. We're bound to apply Supreme Court precedent, principled or not. But many scholars have complained that standing law generally—and aesthetic injury in particular—is doctrinally incoherent. *See, e.g.,* Erwin Chemerinsky, Federal Jurisdiction 81 (8th ed. 2021) ("It is difficult to identify a principle that explains why

No. 22-30609

* * *

This discussion of standing says nothing, of course, about how one might view the underlying merits of this case. If the Center establishes standing in a future case, a court may have to decide whether Federal law forbids Azalea Garden from conducting criminal background checks, considering that Federal law permits and even compels criminal background checks in a variety of contexts. But that's not before us today. I agree with the majority that the Center has not alleged standing. Accordingly, I concur.

---

aesthetic or economic injuries are sufficient for standing, but stigma or marital happiness are not."); Sunstein, 47 UCLA L. Rev. at 1334 n.1 ("there is an oddity, and perhaps a pernicious one, in . . . distinguishing between human beings and animals"); Elliott, 87 Ind. L.J. at 558 ("standing doctrine has been criticized extensively" as "incoherent, manipulable, doctrinally confused, . . . one of the most amorphous concepts in the entire domain of public law") (quotations omitted); Rachel Bayefsky, *Psychological Harm and Constitutional Standing*, 81 Brooklyn L. Rev. 1555, 1559 (2016); Skopek, 122 Harv. L. Rev. at 1206–7, 1214–15.

No. 22-30609

Jennifer Walker Elrod, *Circuit Judge*, dissenting:

"[A]n organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999).  Because the majority opinion departs from this straightforward and binding formulation of organizational standing doctrine, I respectfully dissent.

In my view, this appeal is controlled by the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  In that case the Court held that there could be "no question" that a housing nonprofit "suffered injury in fact" if, "as broadly alleged, petitioners' steering practices have perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers . . . ." *Id*. at 379. It then deemed the following allegation sufficient to plead organizational standing.

> Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services.  Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices.

*Id*. (alteration in original) (quoting the complaint).

Compared to the general allegations in *Havens Realty*, which vaguely referenced "counseling and other referral services," Fair Housing's complaint is robust with detail.  Fair Housing identifies specific initiatives that have been impacted by Azalea Garden's allegedly unlawful conduct:

> LaFHAC has diverted its resources away from other planned projects and activities in furtherance of its mission.  Those planned projects and activities included LaFHAC's annual fair

housing conference, recruitment of sponsors for LaFHAC community events, fair housing training events for landlords, and other projects and activities. The diversion of resources occasioned by Defendant's discriminatory conduct impaired or impeded these projects and activities.

Fair Housing alleges that its annual conference, recruitment efforts, and training programs have been "perceptibly impaired" by Azalea Garden. *Id.* That is "concrete and demonstrable injury to the organization's activities." *Id.* There can, therefore, "be no question that the organization has suffered injury in fact." *Id.* Nor does it matter that Fair Housing could have chosen not to divert its resources to address Azalea Garden's alleged violations. One does not lose standing simply because he could have chosen to take his stand somewhere else. *See id.* at 379 n.20 (explaining that the fact that "the alleged injury results from the organization's noneconomic interest in encouraging open housing does not effect the nature of the injury suffered, and does not deprive the organization of standing" (citation omitted)); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263 (1977) (contrasting an "abstract concern about a problem of general interest" with a plaintiff's concrete actions in pursuit of that interest in the form of electing to build affordable housing).

The majority opinion resists this conclusion, stating that Fair Housing "nowhere explains how any of [its] activities were canceled, postponed, or 'otherwise curtailed.'" *Ante* at 10–11 (quoting *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)) (alteration accepted). Therefore, the majority opinion concludes, Fair Housing's allegations are "insufficient for injury." *Ante* at 11. But if this were true of Fair Housing's allegations here, it was even more true of the vague allegations the plaintiff presented in *Havens Realty*. The Supreme Court, though, thought otherwise. Fair

Housing's allegations are more than sufficient to support an injury under
*Havens Realty*.

Meanwhile, the majority opinion's attempt to brush *Havens Realty*
aside on other grounds is not convincing. *See ante* at 13. The Supreme
Court's broad holding in that case was not confined to situations where
impairment of an organization's activities took the narrow form of "fewer
individuals" being assisted.[1] Rather, what mattered was simply that the
organization's "ability" to conduct its other activities was impaired by the
"drain on the organization's resources" caused by the defendants' practices.
*Havens Realty*, 455 U.S. at 379. Fair Housing has alleged as much here.

If this case were to proceed, Fair Housing, like the plaintiff in *Havens
Realty*, would eventually be required to present evidence to "demonstrate at
trial that it has indeed suffered impairment in its role of facilitating open
housing." *Id.* n.20. But we are not there yet. "At the pleading stage,
'general factual allegations of injury resulting from the defendant's conduct
may suffice [to show standing], for on a motion to dismiss we presume[e] that
general allegations embrace those specific facts that are necessary to support
the claim.'" *Fowler*, 178 F.3d at 357 (quoting *Meadowbriar Home for Children,
Inc. v. Gunn*, 81 F.3d 521, 529 (5th Cir. 1996)).

This would be a different case if Fair Housing were tightening its belt
only to afford the expenses attendant to this litigation. *See OCA-Greater
Houston v. Texas*, 867 F.3d 604, 611 (5th Cir. 2017) (reaffirming the
"fundamental" rule "that no plaintiff may claim as injury the expense of

---

[1] In any event, in the same way fewer individuals could be reached because of the
alleged impairment of HOME's ability to conduct counseling and referral services, *ante* at
13, fewer individuals will be reached because of the alleged impairment of Fair Housing's
ability to conduct conferences and landlord training events. The supposed distinction the
Majority is homing in on is therefore unclear.

preparing for litigation"). But Fair Housing has not alleged its litigation expenses as its injury. It has alleged diversion of resources from specified projects to the expense of combatting the fallout from discrimination at Azalea Garden. Specifically, to the expense required to send more testers to Azalea Garden. This information gathering is necessary, they allege, to develop more accurate information about Azalea Garden's unwritten policies; information that Fair Housing hopes will help those seeking housing in Jefferson, Louisiana. That is precisely the sort of injury we have previously found sufficient to create standing. *See id*. at 612 (holding that an organization's diversion of resources to counteract the effect of allegedly unlawful practices created standing because those resources were spent "not with a view toward litigation, but toward mitigating [the] real-world impact" of those practices).

Although the majority opinion does not reach the traceability prong of standing, *see ante* at 6, a brief discussion is warranted. This case does not present the traceability problem that has featured in some of our precedents. In *Fowler*, for example, we held that the plaintiff lacked organizational standing with respect to certain claims because it failed to connect its diversion of resources to particular unlawful acts of the defendant. 178 F.3d at 359. For example, the plaintiff "failed to show that any of its purported injuries relating to" the costs of monitoring Louisiana's voter registration procedures "were in any way caused by" the conduct the plaintiff was challenging. *Id*. Such monitoring was "part of the normal, day-to-day operations of the plaintiff." *Id*. Similarly, in *Texas State LULAC v. Elfant*, we held that the plaintiff organization "fail[ed] to link any diversion of resources specifically" to the challenged election law because the plaintiff repeatedly identified a tranche of new election laws—of which the challenged law was only one—as the source of its injuries. 52 F.4th 248, 254 (5th Cir. 2022); *see also id*. (holding that "[a]n organizational plaintiff must show it

No. 22-30609

diverted resources 'as a direct result of' the challenged law—not as a result of the challenged law and others like it" (citation omitted)).

Traceability is not an issue for Fair Housing. Its complaint identifies "counteraction efforts . . . made specifically in response to Defendant's conduct." *Cf. Fowler*, 178 F.3d at 357 (explaining that, "[a]t the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume[e] that general allegations embrace those specific facts that are necessary to support the claim.'" (quoting *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 529 (5th Cir. 1996))).

\*     \*     \*

To adequately plead organizational standing, a plaintiff organization need only allege that it "has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices." *Havens Realty*, 455 U.S. at 379 (alteration in original) (quoting the complaint). Fair Housing did that, which perhaps explains why the district court did not perceive a standing issue—and why, even now, Azalea Garden does not dispute that Fair Housing has standing to bring this suit. Yet we have poured out Fair Housing before it has even had the chance to present evidence of its injury.[2]

I respectfully dissent.

---

[2] The majority opinion suggests that Fair Housing may "replead its claims anew" in a manner that would satisfy the requirements the majority opinion has imposed. *Ante* at 13. I agree. But I do not believe such an exercise to be necessary.